CALIFORNIA et al. *v.* LaRUE et al.

No. 71–36.  Argued October 10, 1972—Decided December 5, 1972

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, BLACKMUN, and POWELL, JJ., joined.  STEWART, J., filed a concurring opinion, *post,* p. 119.  DOUGLAS, J., *post,* p. 120, BRENNAN, J., *post,* p. 123, and MARSHALL, J., *post,* p. 123, filed dissenting opinions.

*L. Stephen Porter,* Deputy Attorney General of California,

*Harrison W. Hertzberg* and *Kenneth Scholtz* argued the cause for appellees.

Mr. Justice Rehnquist delivered the opinion of the Court.

Appellant Kirby is the director of the Department of Alcoholic Beverage Control, an administrative agency vested by the California Constitution with primary authority for the licensing of the sale of alcoholic beverages in that State, and with the authority to suspend or revoke any such license if it determines that its continuation would be contrary to public welfare or morals. Art. XX, § 22, California Constitution. Appellees include holders of various liquor licenses issued by appellant, and dancers at premises operated by such licensees. In 1970 the Department promulgated rules regulating the type of entertainment that might be presented in bars and nightclubs that it licensed. Appellees then brought this action in the United States District Court for the Central District of California under the provisions of 28 U. S. C. §§ 1331, 1343, 2201, 2202, and 42 U. S. C. § 1983. A three-judge court was convened in accordance with 28 U. S. C. §§ 2281 and 2284, and the majority of that court held that substantial portions of the regulations conflicted with the First and Fourteenth Amendments to the United States Constitution.[1]

Concerned with the progression in a few years' time from "topless" dancers to "bottomless" dancers and other forms of "live entertainment" in bars and nightclubs that it licensed, the Department heard a number of witnesses on this subject at public hearings held prior to the promulgation of the rules. The majority opinion

---

[1] Appellees in their brief here suggest that the regulations may exceed the authority conferred upon the Department as a matter of state law. As the District Court recognized, however, such a claim is not cognizable in the suit brought by these appellees under 42 U. S. C. § 1983.

of the District Court described the testimony in these words:

"Law enforcement agencies, counsel and owners of licensed premises and investigators for the Department testified. The story that unfolded was a sordid one, primarily relating to sexual conduct between dancers and customers. . . ." 326 F. Supp. 348, 352.

References to the transcript of the hearings submitted by the Department to the District Court indicated that in licensed establishments where "topless" and "bottomless" dancers, nude entertainers, and films displaying sexual acts were shown, numerous incidents of legitimate concern to the Department had occurred. Customers were found engaging in oral copulation with women entertainers; customers engaged in public masturbation; and customers placed rolled currency either directly into the vagina of a female entertainer, or on the bar in order that she might pick it up herself. Numerous other forms of contact between the mouths of male customers and the vaginal areas of female performers were reported to have occurred.

Prostitution occurred in and around such licensed premises, and involved some of the female dancers. Indecent exposure to young girls, attempted rape, rape itself, and assaults on police officers took place on or immediately adjacent to such premises.

At the conclusion of the evidence, the Department promulgated the regulations here challenged, imposing standards as to the type of entertainment that could be presented in bars and nightclubs that it licensed. Those portions of the regulations found to be unconstitutional by the majority of the District Court prohibited the following kinds of conduct on licensed premises:

(a) The performance of acts, or simulated acts, of "sexual intercourse, masturbation, sodomy,

bestiality, oral copulation, flagellation or any sexual acts which are prohibited by law";

(b) The actual or simulated "touching, caressing or fondling on the breast, buttocks, anus or genitals";

(c) The actual or simulated "displaying of the pubic hair, anus, vulva or genitals";

(d) The permitting by a licensee of "any person to remain in or upon the licensed premises who exposes to public view any portion of his or her genitals or anus"; and, by a companion section,

(e) The displaying of films or pictures depicting acts a live performance of which was prohibited by the regulations quoted above. Rules 143.3 and 143.4.[2]

Shortly before the effective date of the Department's regulations, appellees unsuccessfully sought discretionary review of them in both the State Court of Appeal and the Supreme Court of California. The Department then joined with appellees in requesting the three-judge District Court to decide the merits of appellees' claims that the regulations were invalid under the Federal Constitution.[3]

---

[2] In addition to the regulations held unconstitutional by the court below, appellees originally challenged Rule 143.2 prohibiting topless waitresses, Rule 143.3 (2) requiring certain entertainers to perform on a stage at a distance away from customers, and Rule 143.5 prohibiting any entertainment that violated local ordinances. At oral argument in that court they withdrew their objections to these rules, conceding "that topless waitresses are not within the protection of the First Amendment; that local ordinances must be independently challenged depending upon their content; and that the requirement that certain entertainers must dance on a stage is not invalid." 326 F. Supp. 348, 350–351.

[3] MR. JUSTICE DOUGLAS in his dissenting opinion suggests that the District Court should have declined to adjudicate the merits of appellees' contention until the appellants had given the "generalized

The District Court majority upheld the appellees' claim that the regulations in question unconstitutionally abridged the freedom of expression guaranteed to them by the First and Fourteenth Amendments to the United States Constitution. It reasoned that the state regulations had to be justified either as a prohibition of obscenity in accordance with the *Roth* line of decisions in this Court (*Roth* v. *United States,* 354 U. S. 476 (1957)), or else as a regulation of "conduct" having a communicative element in it under the standards

provisions of the rules . . . particularized meaning." Since parties may not confer jurisdiction either upon this Court or the District Court by stipulation, the request of both parties in this case that the court below adjudicate the merits of the constitutional claim does not foreclose our inquiry into the existence of an "actual controversy" within the meaning of 28 U. S. C. § 2201 and Art. III, § 2, cl. 1, of the Constitution.

By pretrial stipulation, the appellees admitted they offered performances and depictions on their licensed premises that were proscribed by the challenged rules. Appellants stipulated they would take disciplinary action against the licenses of licensees violating such rules. In similar circumstances, this Court held that where a state commission had "plainly indicated" an intent to enforce an act that would affect the rights of the United States, there was a "present and concrete" controversy within the meaning of 28 U. S. C. § 2201 and of Art. III. *California Comm'n* v. *United States,* 355 U. S. 534, 539 (1958). The District Court therefore had jurisdiction of this action.

Whether this Court should develop a nonjurisdictional limitation on actions for declaratory judgments to invalidate statutes on their face is an issue not properly before us. Cf. *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 341 (1936) (Brandeis, J., concurring). Certainly a number of our cases have permitted attacks on First Amendment grounds similar to those advanced by the appellees, see, *e. g., Zwickler* v. *Koota,* 389 U. S. 241 (1967); *Keyishian* v. *Board of Regents,* 385 U. S. 589 (1967); *Baggett* v. *Bullitt,* 377 U. S. 360 (1964), and we are not inclined to reconsider the procedural holdings of those cases in the absence of a request by a party to do so.

laid down by this Court in *United States* v. *O'Brien,* 391 U. S. 367 (1968). Concluding that the regulations would bar some entertainment that could not be called obscene under the *Roth* line of cases, and that the governmental interest being furthered by the regulations did not meet the tests laid down in *O'Brien,* the court enjoined the enforcement of the regulations. 326 F. Supp. 348. We noted probable jurisdiction. 404 U. S. 999.

The state regulations here challenged come to us, not in the context of censoring a dramatic performance in a theater, but rather in a context of licensing bars and nightclubs to sell liquor by the drink. In *Seagram & Sons* v. *Hostetter,* 384 U. S. 35, 41 (1966), this Court said:

> "Consideration of any state law regulating intoxicating beverages must begin with the Twenty-first Amendment, the second section of which provides that: 'The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.' "

While the States, vested as they are with general police power, require no specific grant of authority in the Federal Constitution to legislate with respect to matters traditionally within the scope of the police power, the broad sweep of the Twenty-first Amendment has been recognized as conferring something more than the normal state authority over public health, welfare, and morals. In *Hostetter* v. *Idlewild Liquor Corp.,* 377 U. S. 324, 330 (1964), the Court reaffirmed that by reason of the Twenty-first Amendment "a State is totally unconfined by traditional Commerce Clause limitations when it restricts the importation of intoxicants destined for use, distribution, or consumption within its borders." Still

earlier, the Court stated in *State Board* v. *Young's Market Co.,* 299 U. S. 59, 64 (1936):

"A classification recognized by the Twenty-first Amendment cannot be deemed forbidden by the Fourteenth."

These decisions did not go so far as to hold or say that the Twenty-first Amendment supersedes all other provisions of the United States Constitution in the area of liquor regulations. In *Wisconsin* v. *Constantineau,* 400 U. S. 433 (1971), the fundamental notice and hearing requirement of the Due Process Clause of the Fourteenth Amendment was held applicable to Wisconsin's statute providing for the public posting of names of persons who had engaged in excessive drinking. But the case for upholding state regulation in the area covered by the Twenty-first Amendment is undoubtedly strengthened by that enactment:

"Both the Twenty-first Amendment and the Commerce Clause are parts of the same Constitution. Like other provisions of the Constitution, each must be considered in the light of the other, and in the context of the issues and interests at stake in any concrete case." *Hostetter* v. *Idlewild Liquor Corp., supra,* at 332.

A common element in the regulations struck down by the District Court appears to be the Department's conclusion that the sale of liquor by the drink and lewd or naked dancing and entertainment should not take place in bars and cocktail lounges for which it has licensing responsibility. Based on the evidence from the hearings that it cited to the District Court, and mindful of the principle that in legislative rulemaking the agency may reason from the particular to the general, *Assigned Car Cases,* 274 U. S. 564, 583 (1927), we do

not think it can be said that the Department's conclusion in this respect was an irrational one.

Appellees insist that the same results could have been accomplished by requiring that patrons already well on the way to intoxication be excluded from the licensed premises. But wide latitude as to choice of means to accomplish a permissible end must be accorded to the state agency that is itself the repository of the State's power under the Twenty-first Amendment. *Seagram & Sons* v. *Hostetter, supra,* at 48. Nothing in the record before us or in common experience compels the conclusion that either self-discipline on the part of the customer or self-regulation on the part of the bartender could have been relied upon by the Department to secure compliance with such an alternative plan of regulation. The Department's choice of a prophylactic solution instead of one that would have required its own personnel to judge individual instances of inebriation cannot, therefore, be deemed an unreasonable one under the holdings of our prior cases. *Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 487–488 (1955).

We do not disagree with the District Court's determination that these regulations on their face would proscribe some forms of visual presentation that would not be found obscene under *Roth* and subsequent decisions of this Court. See, *e. g., Sunshine Book Co.* v. *Summerfield,* 355 U. S. 372 (1958), rev'g *per curiam,* 101 U. S. App. D. C. 358, 249 F. 2d 114 (1957). But we do not believe that the state regulatory authority in this case was limited to either dealing with the problem it confronted within the limits of our decisions as to obscenity, or in accordance with the limits prescribed for dealing with some forms of communicative conduct in *O'Brien, supra.*

Our prior cases have held that both motion pictures and theatrical productions are within the protection of

the First and Fourteenth Amendments. In *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495 (1952), it was held that motion pictures are "included within the free speech and free press guaranty of the First and Fourteenth Amendments," though not "necessarily subject to the precise rules governing any other particular method of expression." *Id.,* at 502–503. In *Schacht* v. *United States,* 398 U. S. 58, 63 (1970), the Court said with respect to theatrical productions:

> "An actor, like everyone else in our country, enjoys a constitutional right to freedom of speech, including the right openly to criticize the Government during a dramatic performance."

But as the mode of expression moves from the printed page to the commission of public acts that may themselves violate valid penal statutes, the scope of permissible state regulations significantly increases. States may sometimes proscribe expression that is directed to the accomplishment of an end that the State has declared to be illegal when such expression consists, in part, of "conduct" or "action," *Hughes* v. *Superior Court,* 339 U. S. 460 (1950); *Giboney* v. *Empire Storage Co.,* 336 U. S. 490 (1949).[4] In *O'Brien, supra,* the Court suggested that the extent to which "conduct" was protected by the First Amendment depended on the presence of a "communicative element," and stated:

> "We cannot accept the view that an apparently

---

[4] Similarly, States may validly limit the manner in which the First Amendment freedoms are exercised, by forbidding sound trucks in residential neighborhoods, *Kovacs* v. *Cooper,* 336 U. S. 77 (1949), and may enforce a nondiscriminatory requirement that those who would parade on a public thoroughfare first obtain a permit. *Cox* v. *New Hampshire,* 312 U. S. 569 (1941). Other state limitations on the "time, manner and place" of the exercise of First Amendment rights have been sustained. See, *e. g., Cameron* v. *Johnson,* 390 U. S. 611 (1968), and *Cox* v. *Louisiana,* 379 U. S. 559 (1965).

limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." 391 U. S., at 376.

The substance of the regulations struck down prohibits licensed bars or nightclubs from displaying, either in the form of movies or live entertainment, "performances" that partake more of gross sexuality than of communication. While we agree that at least some of the performances to which these regulations address themselves are within the limits of the constitutional protection of freedom of expression, the critical fact is that California has not forbidden these performances across the board. It has merely proscribed such performances in establishments that it licenses to sell liquor by the drink.

Viewed in this light, we conceive the State's authority in this area to be somewhat broader than did the District Court. This is not to say that all such conduct and performance are without the protection of the First and Fourteenth Amendments. But we would poorly serve both the interests for which the State may validly seek vindication and the interests protected by the First and Fourteenth Amendments were we to insist that the sort of bacchanalian revelries that the Department sought to prevent by these liquor regulations were the constitutional equivalent of a performance by a scantily clad ballet troupe in a theater.

The Department's conclusion, embodied in these regulations, that certain sexual performances and the dispensation of liquor by the drink ought not to occur at premises that have licenses was not an irrational one. Given the added presumption in favor of the validity of the state regulation in this area that the Twenty-first

Amendment requires, we cannot hold that the regulations on their face violate the Federal Constitution.[5]

The contrary holding of the District Court is therefore

*Reversed.*

MR. JUSTICE STEWART, concurring.

A State has broad power under the Twenty-first Amendment to specify the times, places, and circumstances where liquor may be dispensed within its borders. *Seagram & Sons* v. *Hostetter,* 384 U. S. 35; *Hostetter* v. *Idlewild Liquor Corp.,* 377 U. S. 324, 330; *Dept. of Revenue* v. *James Beam Co.,* 377 U. S. 341, 344, 346; *California* v. *Washington,* 358 U. S. 64; *Ziffrin, Inc.* v. *Reeves,* 308 U. S. 132; *Mahoney* v. *Joseph Triner Corp.,* 304 U. S. 401; *State Board* v. *Young's Market Co.,* 299 U. S. 59. I should suppose, therefore, that nobody would question the power of California to prevent the sale of liquor by the drink in places where food is not served, or where dancing is permitted, or where gasoline is sold. But here California has provided that liquor by the drink shall not be sold in places where certain grossly sexual exhibitions are performed; and that action by the State, say the appellees, violates the First and Fourteenth Amendments. I cannot agree.

Every State is prohibited by these same Amendments from invading the freedom of the press and from im-

---

[5] Because of the posture of this case, we have necessarily dealt with the regulations on their face, and have found them to be valid. The admonition contained in the Court's opinion in *Seagram & Sons* v. *Hostetter,* 384 U. S. 35, 52 (1966), is equally in point here: "Although it is possible that specific future applications of [the statute] may engender concrete problems of constitutional dimension, it will be time enough to consider any such problems when they arise. We deal here only with the statute on its face. And we hold that, so considered, the legislation is constitutionally valid."

pinging upon the free exercise of religion. But does this mean that a State cannot provide that liquor shall not be sold in bookstores, or within 200 feet of a church? I think not. For the State would not thereby be interfering with the First Amendment activities of the church or the First Amendment business of the bookstore. It would simply be controlling the distribution of liquor, as it has every right to do under the Twenty-first Amendment. On the same premise, I cannot see how the liquor regulations now before us can be held, on their face, to violate the First and Fourteenth Amendments.*

It is upon this constitutional understanding that I join the opinion and judgment of the Court.

MR. JUSTICE DOUGLAS, dissenting.

This is an action for a declaratory judgment, challenging Rules and Regulations of the Department of Alcoholic Beverage Control of California. It is a challenge of the constitutionality of the rules on their face; no application of the rules has in fact been made to appellees by the institution of either civil or criminal proceedings. While the case meets the requirements of "case or controversy" within the meaning of Art. III of the Constitution and therefore complies with *Aetna Life Ins. Co.* v. *Haworth,* 300 U. S. 227, the case does not mark the precise impact of these rules against licensees who sell alcoholic beverages in California. The opinion

---

*This is not to say that the Twenty-first Amendment empowers a State to act with total irrationality or invidious discrimination in controlling the distribution and dispensation of liquor within its borders. And it most assuredly is not to say that the Twenty-first Amendment necessarily overrides in its allotted area any other relevant provision of the Constitution. See *Wisconsin* v. *Constantineau,* 400 U. S. 433; *Hostetter* v. *Idlewild Liquor Corp.,* 377 U. S. 324, 329–334; *Dept. of Revenue* v. *James Beam Co.,* 377 U. S. 341.

of the Court can, therefore, only deal with the rules in the abstract.

The line which the Court draws between "expression" and "conduct" is generally accurate; and it also accurately describes in general the reach of the police power of a State when "expression" and "conduct" are closely brigaded. But we still do not know how broadly or how narrowly these rules will be applied.

It is conceivable that a licensee might produce in a garden served by him a play—Shakespearean perhaps or one in a more modern setting—in which, for example, "fondling" in the sense of the rules appears. I cannot imagine that any such performance could constitutionally be punished or restrained, even though the police power of a State is now buttressed by the Twenty-first Amendment.[1] For, as stated by the Court, that Amendment did not supersede all other constitutional provisions "in the area of liquor regulations." Certainly a play which passes muster under the First Amendment is not made illegal because it is performed in a beer garden.

Chief Justice Hughes stated the controlling principle in *Electric Bond & Share Co.* v. *SEC*, 303 U. S. 419, 443:

> "Defendants are not entitled to invoke the Federal Declaratory Judgment Act in order to obtain an advisory decree upon a hypothetical state of facts. . . . By the cross bill, defendants seek a judgment that each and every provision of the Act is unconstitutional. It presents a variety of hypothetical controversies which may never become real. We are invited to enter into a speculative inquiry for the

---

[1] Section 2 of the Twenty-first Amendment reads as follows:

"The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

purpose of condemning statutory provisions the effect of which in concrete situations, not yet developed, cannot now be definitely perceived. We must decline that invitation. . . ."

The same thought was expressed by Chief Justice Stone in *Federation of Labor* v. *McAdory*, 325 U. S. 450, 470–471. Some provisions of an Alabama law regulating labor relations were challenged as too vague and uncertain to meet constitutional requirements. The Chief Justice noted that state courts often construe state statutes so that in their application they are not open to constitutional objections. *Id.*, at 471. He said that for us to decide the constitutional question "by anticipating such an authoritative construction" would be either "to decide the question unnecessarily or rest our decision on the unstable foundation of our own construction of the state statute which the state court would not be bound to follow." [2] *Ibid.* He added:

"In any event the parties are free to litigate in the state courts the validity of the statute when actually applied to any definite state of facts, with the right of appellate review in this Court. In the exercise of this Court's discretionary power to grant or withhold the declaratory judgment remedy it is of controlling significance that it is in the public interest to avoid the needless determination of constitutional questions and the needless obstruction to the domestic policy of the states by forestalling state action in construing and applying its own statutes." *Ibid.*

Those precedents suggest to me that it would have been more provident for the District Court to have de-

---

[2] Even in cases on direct appeal from a state court, when the decision below leaves unresolved questions of state law or procedure which bear on federal constitutional questions, we dismiss the appeal. *Rescue Army* v. *Municipal Court*, 331 U. S. 549.

clined to give a federal constitutional ruling, until and unless the generalized provisions of the rules were given particularized meaning.

MR. JUSTICE BRENNAN, dissenting.

I dissent. The California regulation at issue here clearly applies to some speech protected by the First Amendment, as applied to the States through the Due Process Clause of the Fourteenth Amendment, and also, no doubt, to some speech and conduct which are unprotected under our prior decisions. See *Memoirs* v. *Massachusetts,* 383 U. S. 413 (1966); *Roth* v. *United States,* 354 U. S. 476 (1957). The State points out, however, that the regulation does not prohibit speech directly, but speaks only to the conditions under which a license to sell liquor by the drink can be granted and retained. But, as MR. JUSTICE MARSHALL carefully demonstrates in Part II of his dissenting opinion, by requiring the owner of a nightclub to forgo the exercise of certain rights guaranteed by the First Amendment, the State has imposed an unconstitutional condition on the grant of a license. See *Perry* v. *Sindermann,* 408 U. S. 593 (1972); *Sherbert* v. *Verner,* 374 U. S. 398 (1963); *Speiser* v. *Randall,* 357 U. S. 513 (1958). Nothing in the language or history of the Twenty-first Amendment authorizes the .States to use their liquor licensing power as a means for the deliberate inhibition of protected, even if distasteful, forms of expression. For that reason, I would affirm the judgment of the District Court.

MR. JUSTICE MARSHALL, dissenting.

In my opinion, the District Court's judgment should be affirmed. The record in this case is not a pretty one, and it is possible that the State could constitutionally punish some of the activities described therein

under a narrowly drawn scheme. But appellees challenge these regulations [1] on their face, rather than as applied to a specific course of conduct.[2] Cf. *Gooding*

---

[1] Rule 143.3 (1) provides in relevant part:

"No licensee shall permit any person to perform acts of or acts which simulate:

"(a) Sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation or any sexual acts which are prohibited by law.

"(b) The touching, caressing or fondling on the breast, buttocks, anus or genitals.

"(c) The displaying of the pubic hair, anus, vulva or genitals."

Rule 143.4 prohibits: "The showing of film, still pictures, electronic reproduction, or other visual reproductions depicting:

"(1) Acts or simulated acts of sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation or any sexual acts which are prohibited by law.

"(2) Any person being touched, caressed or fondled on the breast, buttocks, anus or genitals.

"(3) Scenes wherein a person displays the vulva or the anus or the genitals.

"(4) Scenes wherein artificial devices or inanimate objects are employed to depict, or drawings are employed to portray, any of the prohibited activities described above."

[2] This is not an appropriate case for application of the abstention doctrine. Since these regulations are challenged on their face for overbreadth, no purpose would be served by awaiting a state court construction of them unless the principles announced in *Younger* v. *Harris*, 401 U. S. 37 (1971), govern. See *Zwickler* v. *Koota*, 389 U. S. 241, 248–250 (1967). Thus far, however, we have limited the applicability of *Younger* to cases where the plaintiff has an adequate remedy in a pending *criminal* prosecution. See *Younger* v. *Harris*, *supra*, at 43–44. Cf. *Douglas* v. *City of Jeannette*, 319 U. S. 157 (1943). But cf. *Berryhill* v. *Gibson*, 331 F. Supp. 122, 124 (MD Ala. 1971), probable jurisdiction noted, 408 U. S. 920 (1972). The California licensing provisions are, of course, civil in nature. Cf. *Hearn* v. *Short*, 327 F. Supp. 33 (SD Tex. 1971). Moreover, the *Younger* doctrine has been held to "have little force in the absence of a *pending* state proceeding." *Lake Carriers' Assn.* v. *MacMullan*, 406 U. S. 498, 509 (1972) (emphasis added). There are at present no proceedings of any kind pending against these

v. *Wilson,* 405 U. S. 518 (1972). When so viewed, I
think it clear that the regulations are overbroad and
therefore unconstitutional. See, *e. g., Dombrowski* v.
*Pfister,* 380 U. S. 479, 486 (1965).[3] Although the State's
broad power to regulate the distribution of liquor and
to enforce health and safety regulations is not to be
doubted, that power may not be exercised in a manner
that broadly stifles First Amendment freedoms. Cf.
*Shelton* v. *Tucker,* 364 U. S. 479, 488 (1960). Rather,
as this Court has made clear, "[p]recision of regulation

appellees. Finally, since the *Younger* doctrine rests heavily on fed-
eral deference to state administration of its own statutes, see *Younger*
v. *Harris, supra,* at 44–45, it is waivable by the State. Cf. *Hostetter*
v. *Idlewild Liquor Corp.,* 377 U. S. 324, 329 (1964). Appellants
have nowhere mentioned the *Younger* doctrine in their brief
before this Court, and when the case was brought to the atten-
tion of the attorney for the appellants during oral argument, he ex-
pressly eschewed reliance on it. In the court below, appellants
specifically asked for a federal decision on the validity of California's
regulations and stated that they did not think the court should
abstain. See 326 F. Supp. 348, 351 (CD Cal. 1971).

[3] I am startled by the majority's suggestion that the regulations
are constitutional on their face even though "specific future applica-
tions of [the statute] may engender concrete problems of constitu-
tional dimension." (Quoting with approval *Seagram & Sons* v.
*Hostetter,* 384 U. S. 35, 52 (1966). *Ante,* at 119 n. 5.) Ever
since *Thornhill* v. *Alabama,* 310 U. S. 88 (1940), it has been thought
that statutes which trench upon First Amendment rights are facially
void even if the conduct of the party challenging them could be
prohibited under a more narrowly drawn scheme. See, *e. g., Baggett*
v. *Bullitt,* 377 U. S. 360, 366 (1964); *Coates* v. *City of Cincinnati,*
402 U. S. 611, 616 (1971); *NAACP* v. *Button,* 371 U. S. 415,
432–433 (1963).

Nor is it relevant that the State here "sought to prevent [bac-
chanalian revelries]" rather than performances by "scantily clad
ballet troupe[s]." Whatever the State "sought" to do, the fact is
that these regulations cover both these activities. And it should be
clear that a praiseworthy legislative motive can no more rehabilitate
an unconstitutional statute than an illicit motive can invalidate a
proper statute.

must be the touchstone" when First Amendment rights are implicated. *NAACP* v. *Button,* 371 U. S. 415, 438 (1963). Because I am convinced that these regulations lack the precision which our prior cases require, I must respectfully dissent.

## I

It should be clear at the outset that California's regulatory scheme does not conform to the standards which we have previously enunciated for the control of obscenity.[4] Before this Court's decision in *Roth* v. *United States,* 354 U. S. 476 (1957), some American courts followed the rule of *Regina* v. *Hicklin,* L. R. 3 Q. B. 360 (1868), to the effect that the obscenity *vel non* of a piece of work could be judged by examining isolated aspects of it. See, *e. g., United States* v. *Kennerley,* 209 F. 119 (1913); *Commonwealth* v. *Buckley,* 200 Mass. 346, 86 N. E. 910 (1909). But in *Roth* we held that "[t]he *Hicklin* test, judging obscenity by the effect of isolated passages upon the most susceptible persons, might well encompass material legitimately treating with sex, and so it must be rejected as unconstitutionally restrictive of the freedoms of speech and press." 354 U. S., at 489. Instead, we held that the material must

---

[4] Indeed, there are some indications in the legislative history that California adopted these regulations for the specific purpose of evading those standards. Thus, Captain Robert Devin of the Los Angeles Police Department testified that the Department favored adoption of the new regulations for the following reason: "While statutory law has been available to us to regulate what was formerly considered as antisocial behavior, the federal and state judicial system has, through a series of similar decisions, effectively emasculated law enforcement in its effort to contain and to control the growth of pornography and of obscenity and of behavior that is associated with this kind of performance." See also testimony of Roy E. June, City Attorney of the City of Costa Mesa; testimony of Richard C. Hirsch, Office of Los Angeles County District Attorney. App. 117.

be "taken as a whole," *ibid.*, and, when so viewed, must appeal to a prurient interest in sex, patently offend community standards relating to the depiction of sexual matters, and be utterly without redeeming social value.[5] See *Memoirs* v. *Massachusetts,* 383 U. S. 413, 418 (1966).

Obviously, the California rules do not conform to these standards. They do not require the material to be judged as a whole and do not speak to the necessity of proving prurient interest, offensiveness to community standards, or lack of redeeming social value. Instead of the contextual test approved in *Roth* and *Memoirs,* these regulations create a system of *per se* rules to be applied regardless of context: Certain acts simply may not be depicted and certain parts of the body may under no circumstances be revealed. The regulations thus treat on the same level a serious movie such as "Ulysses" and a crudely made "stag film." They ban not only obviously pornographic photographs, but also great sculpture from antiquity.[6]

---

[5] I do not mean to suggest that this test need be rigidly applied in all situations. Different standards may be applicable when children are involved, see *Ginsberg* v. *New York,* 390 U. S. 629 (1968); when a consenting adult possesses putatively obscene material in his own home, see *Stanley* v. *Georgia,* 394 U. S. 557 (1969); or when the material by the nature of its presentation cannot be viewed as a whole, see *Rabe* v. *Washington,* 405 U. S. 313, 317 n. 2 (1972) (BURGER, C. J., concurring). Similarly, I do not mean to foreclose the possibility that even the *Roth-Memoirs* test will ultimately be found insufficient to protect First Amendment interests when consenting adults view putatively obscene material in private. Cf. *Redrup* v. *New York,* 386 U. S. 767 (1967). But cf. *United States* v. *Reidel,* 402 U. S. 351 (1971). But I do think that, at very least, *Roth-Memoirs* sets an absolute limit on the kinds of speech that can be altogether read out of the First Amendment for purposes of consenting adults.

[6] Cf. Fuller, Changing Society Puts Taste to the Test, The National Observer, June 10, 1972, p. 24: "Context is the essence of esthetic judgment . . . . There is a world of difference between

*Roth* held 15 years ago that the suppression of serious communication was too high a price to pay in order to vindicate the State's interest in controlling obscenity, and I see no reason to modify that judgment today. Indeed, even the appellants do not seriously contend that these regulations can be justified under the *Roth-Memoirs* test. Instead, appellants argue that California's regulations do not concern the control of pornography at all. These rules, they argue, deal with *conduct* rather than with *speech* and as such are not subject to the strict limitations of the First Amendment.

To support this proposition, appellants rely primarily on *United States* v. *O'Brien,* 391 U. S. 367 (1968), which upheld the constitutionality of legislation punishing the destruction or mutilation of Selective Service certificates. *O'Brien* rejected the notion that "an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea," and held that Government regulation of speech-related conduct is permissible "if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.,* at 376, 377.

---

Playboy and less pretentious girly magazines on the one hand, and on the other, *The Nude,* a picture selection from the whole history of art, by that fine teacher and interpreter of civilization, Kenneth Clark. People may be just as naked in one or the other, the bodies inherently just as beautiful, but the context of the former is vulgar, of the latter, esthetic.

"The same words, the same actions, that are cheap and tawdry in one book or play may contribute to the sublimity, comic universality, or tragic power of others. For a viable theory of taste, context is all."

While I do not quarrel with these principles as stated in the abstract, their application in this case stretches them beyond the breaking point.[7] In *O'Brien,* the Court began its discussion by noting that the statute in question "plainly does not abridge free speech on its face." Indeed, even O'Brien himself conceded that facially the statute dealt "with conduct having no connection with speech."[8] *Id.,* at 375. Here, the situation is quite different. A long line of our cases makes clear that motion pictures, unlike draft-card burning, are a form of expression entitled to prima facie First Amendment protection. "It cannot be doubted that motion pictures are a significant medium for the communication of ideas. They may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression. The importance of motion pictures as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform." *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495, 501 (1952) (footnote omitted). See also *Interstate Circuit, Inc.* v. *City of Dallas,* 390 U. S. 676 (1968); *Jacobellis* v. *Ohio,* 378 U. S.

---

[7] Moreover, even if the *O'Brien* test were here applicable, it is far from clear that it has been satisfied. For example, most of the evils that the State alleges are caused by appellees' performances are already punishable under California law. See n. 11, *infra.* Since the less drastic alternative of criminal prosecution is available to punish these violations, it is hard to see how "the incidental restriction on alleged First Amendment freedoms is no greater than is essential" to further the State's interest.

[8] The Court pointed out that the statute "does not distinguish between public and private destruction, and it does not punish only destruction engaged in for the purpose of expressing views . . . . A law prohibiting destruction of Selective Service certificates no more abridges free speech on its face than a motor vehicle law prohibiting the destruction of drivers' licenses, or a tax law prohibiting the destruction of books and records." 391 U. S., at 375.

184 (1964); *Pinkus* v. *Pitchess,* 429 F. 2d 416 (CA9 1970), aff'd by equally divided court *sub nom. California* v. *Pinkus,* 400 U. S. 922 (1970). Similarly, live performances and dance have, in recent years, been afforded broad prima facie First Amendment protection. See, *e. g., Schacht* v. *United States,* 398 U. S. 58 (1970); *P. B. I. C., Inc.* v. *Byrne,* 313 F. Supp. 757 (Mass. 1970), vacated to consider mootness, 401 U. S. 987 (1971); *In re Giannini,* 69 Cal. 2d 563, 446 P. 2d 535 (1968), cert. denied *sub nom. California* v. *Giannini,* 395 U. S. 910 (1969).

If, as these many cases hold, movies, plays, and the dance enjoy constitutional protection, it follows, ineluctably I think, that their component parts are protected as well. It is senseless to say that a play is "speech" within the meaning of the First Amendment, but that the individual gestures of the actors are "conduct" which the State may prohibit. The State may no more allow movies while punishing the "acts" of which they are composed than it may allow newspapers while punishing the "conduct" of setting type.

Of course, I do not mean to suggest that anything which occurs upon a stage is automatically immune from state regulation. No one seriously contends, for example, that an actual murder may be legally committed so long as it is called for in the script, or that an actor may inject real heroin into his veins while evading the drug laws that apply to everyone else. But once it is recognized that movies and plays enjoy prima facie First Amendment protection, the standard for reviewing state regulation of their component parts shifts dramatically. For while "[m]ere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, [they are] insufficient to justify such as diminishes the exercise of rights so vital" as freedom

of speech. *Schneider* v. *State*, 308 U. S. 147, 161 (1939). Rather, in order to restrict speech, the State must show that the speech is "used in such circumstances and [is] of such a nature as to create a clear and present danger that [it] will bring about the substantive evils that [the State] has a right to prevent." *Schenck* v. *United States*, 249 U. S. 47, 52 (1919). Cf. *Brandenburg* v. *Ohio*, 395 U. S. 444 (1969); *Dennis* v. *United States*, 341 U. S. 494 (1951).[9]

When the California regulations are measured against this stringent standard, they prove woefully inadequate. Appellants defend the rules as necessary to prevent sex crimes, drug abuse, prostitution, and a wide variety of other evils. These are precisely the same interests that have been asserted time and again before this Court as justification for laws banning frank discussion of sex and that we have consistently rejected. In fact, the empirical link between sex-related entertainment and the criminal activity popularly associated with it has never been proved and, indeed, has now been largely discredited. See, *e. g.,* Report of the Commission on Obscenity and Pornography 27 (1970); Cairns, Paul, & Wishner, Sex Censorship: The Assumptions of Anti-Obscenity Laws and the Empirical Evidence, 46 Minn. L. Rev. 1009 (1962). Yet even if one were to concede that such a link existed, it would hardly justify a broad-scale attack on First Amendment freedoms. The only way to stop murders and drug abuse is to punish them directly. But the State's interest in controlling material

---

[9] Of course, the State need not meet the clear and present danger test if the material in question is obscene. See *Roth* v. *United States*, 354 U. S. 476 (1957). But, as argued above, the difficulty with California's rules is that they do not conform to the *Roth* test and therefore regulate material that is not obscene. See *supra,* at 126–127.

dealing with sex is secondary in nature.[10]  It can control rape and prostitution by punishing those acts, rather than by punishing the speech that is one step removed from the feared harm.[11]  Moreover, because First Amendment rights are at stake, the State must adopt this "less restrictive alternative" unless it can make a compelling demonstration that the protected activity and criminal conduct are so closely linked that only through regulation of one can the other be stopped. Cf. *United States* v. *Robel,* 389 U. S. 258, 268 (1967). As we said in *Stanley* v. *Georgia,* 394 U. S. 557, 566–567 (1969), "if the State is only concerned about printed or filmed materials inducing antisocial conduct, we believe that in the context of private consumption of ideas and information we should adhere to the view that '[a]mong free men, the deterrents ordinarily to be applied to pre-

---

[10] This case might be different if the State asserted a primary interest in stopping the very acts performed by these dancers and actors.  However, I have serious doubts whether the State may constitutionally assert an interest in regulating any sexual act between consenting adults.  Cf. *Griswold* v. *Connecticut,* 381 U. S. 479 (1965).  Moreover, it is unnecessary to reach that question in this case since the State's regulations are plainly not designed to stop the acts themselves, most of which are in fact legal when done in private.  Rather, the State punishes the acts only when done in public as part of a dramatic presentation.  Cf. *United States* v. *O'Brien, supra,* at 375.  It must be, therefore, that the asserted state interest stems from the effect of the acts on the audience rather than from a desire to stop the acts themselves.  It should also be emphasized that this case does not present problems of an unwilling audience or of an audience composed of minors.

[11] Indeed, California already has statutes controlling virtually all of the misconduct said to flow from appellees' activities.  See Calif. Penal Code § 647 (b) (Supp. 1972) (prostitution); Calif. Penal Code §§ 261, 263 (1970) (rape); Calif. Bus. & Prof. Code § 25657 (Supp. 1972) ("B-Girl" activity); Calif. Health & Safety Code §§ 11500, 11501, 11721, 11910, 11912 (1964 and Supp. 1972) (sale and use of narcotics).

vent crime are education and punishment for violations of the law . . . .' *Whitney* v. *California,* 274 U. S. 357, 378 (1927) (Brandeis, J., concurring). . . . Given the present state of knowledge, the State may no more prohibit mere possession of obscene matter on the ground that it may lead to antisocial conduct than it may prohibit possession of chemistry books on the ground that they may lead to the manufacture of homemade spirits." [12]

## II

It should thus be evident that, under the standards previously developed by this Court, the California regulations are overbroad: They would seem to suppress not only obscenity outside the scope of the First Amendment, but also speech that is clearly protected. But California contends that these regulations do not involve suppression at all. The State claims that its rules are not regulations of obscenity, but are rather merely regulations of the sale and consumption of liquor. Appellants point out that California does not punish establishments which provide the proscribed entertainment, but only requires that they not serve alcoholic beverages on their premises. Appellants vigorously argue that such regulation falls within the State's general police power as augmented, when alcoholic beverages are involved, by the Twenty-first Amendment.[13]

---

[12] Of course, it is true that *Stanley* does not govern this case, since *Stanley* dealt only with the private possession of obscene materials in one's own home. But in another sense, this case is stronger than *Stanley*. In *Stanley*, we held that the State's interest in the prevention of sex crimes did not justify laws restricting possession of certain materials, even though they were conceded to be obscene. It follows *a fortiori* that this interest is insufficient when the materials are not obscene and, indeed, are constitutionally protected.

[13] The Twenty-first Amendment, in addition to repealing the Eighteenth Amendment, provides: "The transportation or importa-

I must confess that I find this argument difficult to grasp. To some extent, it seems premised on the notion that the Twenty-first Amendment authorizes the States to regulate liquor in a fashion which would otherwise be constitutionally impermissible. But the Amendment by its terms speaks only to state control of the *importation* of alcohol, and its legislative history makes clear that it was intended only to permit "dry" States to control the flow of liquor across their boundaries despite potential Commerce Clause objections.[14] See generally *Seagram & Sons* v. *Hostetter,* 384 U. S. 35 (1966); *Hostetter* v. *Idlewild Liquor Corp.,* 377 U. S. 324 (1964). There is not a word in that history which indicates that Congress meant to tamper in any way with First Amendment rights. I submit that the framers of the Amendment would be astonished to

---

tion into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

[14] The text of the Amendment is based on the Webb-Kenyon Act, 37 Stat. 699, which antedated prohibition. The Act was entitled "An Act Divesting intoxicating liquors of their interstate character in certain cases," and was designed to allow "dry" States to regulate the flow of alcohol across their borders. See, *e. g., McCormick & Co.* v. *Brown,* 286 U. S. 131, 140–141 (1932); *Clark Distilling Co.* v. *Western Maryland R. Co.,* 242 U. S. 311, 324 (1917). The Twenty-first Amendment was intended to embed this principle permanently into the Constitution. As explained by its sponsor on the Senate floor "to assure the so-called dry States against the importation of intoxicating liquor into those States, it is proposed to write permanently into the Constitution a prohibition along that line.

"[T]he pending proposal will give the States that guarantee. When our Government was organized and the Constitution of the United States adopted, the States surrendered control over and regulation of interstate commerce. This proposal is restoring to the States, in effect, the right to regulate commerce respecting a single commodity—namely, intoxicating liquor." 76 Cong. Rec. 4141 (remarks of Sen. Blaine).

discover that they had inadvertently enacted a *pro tanto* repealer of the rest of the Constitution. Only last Term, we held that the State's conceded power to license the distribution of intoxicating beverages did not justify use of that power in a manner that conflicted with the Equal Protection Clause. See *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163, 178–179 (1972). Cf. *Wisconsin* v. *Constantineau,* 400 U. S. 433 (1971); *Hornsby* v. *Allen,* 326 F. 2d 605 (CA5 1964). I am at a loss to understand why the Twenty-first Amendment should be thought to override the First Amendment but not the Fourteenth.

To be sure, state regulation of liquor is important, and it is deeply embedded in our history. See, *e. g.,* *Colonnade Catering Corp.* v. *United States,* 397 U. S. 72, 77 (1970). But First Amendment values are important as well. Indeed, in the past they have been thought so important as to provide an independent restraint on every power of Government. "Freedom of press, freedom of speech, freedom of religion are in a preferred position." *Murdock* v. *Pennsylvania,* 319 U. S. 105, 115 (1943). Thus, when the Government attempted to justify a limitation on freedom of association by reference to the war power, we categorically rejected the attempt. "[The] concept of 'national defense' " we held, "cannot be deemed an end in itself, justifying any exercise of legislative power designed to promote such a goal. Implicit in the term 'national defense' is the notion of defending those values and ideals which set this Nation apart. For almost two centuries, our country has taken singular pride in the democratic ideals enshrined in its Constitution, and the most cherished of those ideals have found expression in the First Amendment. It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties—the freedom of association—which

makes the defense of the Nation worthwhile." *United States* v. *Robel,* 389 U. S., at 264. Cf. *New York Times Co.* v. *United States,* 403 U. S. 713, 716–717 (1971) (Black, J., concurring); *Home Bldg. & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, 426 (1934). If the First Amendment limits the means by which our Government can ensure its very survival, then surely it must limit the State's power to control the sale of alcoholic beverages as well.

Of course, this analysis is relevant only to the extent that California has in fact encroached upon First Amendment rights. Appellants argue that no such encroachment has occurred, since appellees are free to continue providing any entertainment they choose without fear of criminal penalty. Appellants suggest that this case is somehow different because all that is at stake is the "privilege" of serving liquor by the drink.

It should be clear, however, that the absence of criminal sanctions is insufficient to immunize state regulation from constitutional attack. On the contrary, "this is only the beginning, not the end, of our inquiry." *Sherbert* v. *Verner,* 374 U. S. 398, 403–404 (1963). For "[i]t is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Id.,* at 404. As we pointed out only last Term, "[f]or at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally pro-

tected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited." *Perry v. Sindermann,* 408 U. S. 593, 597 (1972).

Thus, unconstitutional conditions on welfare benefits,[15] unemployment compensation,[16] tax exemptions,[17] public employment,[18] bar admissions,[19] and mailing privileges [20] have all been invalidated by this Court. In none of these cases were criminal penalties involved. In all of them, citizens were left free to exercise their constitutional rights so long as they were willing to give up a "gratuity" that the State had no obligation to provide. Yet in all of them, we found that the discriminatory provision of a privilege placed too great a burden on constitutional freedoms. I therefore have some difficulty in understanding why California nightclub proprietors ·should be singled out and informed that they alone must sacrifice their constitutional rights before gaining the "privilege" to serve liquor.

Of course, it is true that the State may in proper circumstances enact a broad regulatory scheme that incidentally restricts First Amendment rights. For example, if California prohibited the sale of alcohol altogether, I do not mean to suggest that the proprietors

---

[15] See *Shapiro* v. *Thompson,* 394 U. S. 618 (1969). But cf. *Wyman* v. *James,* 400 U. S. 309 (1971).

[16] See *Sherbert* v. *Verner,* 374 U. S. 398 (1963).

[17] See *Speiser* v. *Randall,* 357 U. S. 513 (1958).

[18] See, *e. g., Pickering* v. *Board of Education,* 391 U. S. 563 (1968); *Keyishian* v. *Board of Regents,* 385 U. S. 589 (1967); *Baggett* v. *Bullitt,* 377 U. S. 360 (1964).

[19] See, *e. g., Baird* v. *State Bar of Arizona,* 401 U. S. 1 (1971); *Konigsberg* v. *State Bar,* 353 U. S. 252 (1957); *Schware* v. *Board of Bar Examiners,* 353 U. S. 232 (1957). But cf. *Law Students Civil Rights Research Council* v. *Wadmond,* 401 U. S. 154 (1971); *Konigsberg* v. *State Bar,* 366 U. S. 36 (1961).

[20] See, *e. g., Blount* v. *Rizzi,* 400 U. S. 410 (1971); *Hannegan* v. *Esquire Inc.,* 327 U. S. 146, 156 (1946).

of theaters and bookstores would be constitutionally entitled to a special dispensation. But in that event, the classification would not be speech related and, hence, could not be rationally perceived as penalizing speech. Classifications that discriminate against the exercise of constitutional rights *per se* stand on an altogether different footing. They must be supported by a "compelling" governmental purpose and must be carefully examined to insure that the purpose is unrelated to mere hostility to the right being asserted. See, *e. g., Shapiro* v. *Thompson,* 394 U. S. 618, 634 (1969).

Moreover, not only is this classification speech related; it also discriminates between otherwise indistinguishable parties on the basis of the *content* of their speech. Thus, California nightclub owners may present live shows and movies dealing with a wide variety of topics while maintaining their licenses. But if they choose to deal with sex, they are treated quite differently. Classifications based on the content of speech have long been disfavored and must be viewed with the gravest suspicion. See, *e. g., Cox* v. *Louisiana,* 379 U. S. 536, 556–558 (1965). Whether this test is thought to derive from equal protection analysis, see *Police Department of Chicago* v. *Mosley,* 408 U. S. 92 (1972); *Niemotko* v. *Maryland,* 340 U. S. 268 (1951), or directly from the substantive constitutional provision involved, see *Cox* v. *Louisiana, supra; Schneider* v. *State,* 308 U. S. 147 (1939), the result is the same: any law that has "no other purpose . . . than to chill the assertion of constitutional rights by penalizing those who choose to exercise them . . . [is] patently unconstitutional." *United States* v. *Jackson,* 390 U. S. 570, 581 (1968).

As argued above, the constitutionally permissible purposes asserted to justify these regulations are too remote to satisfy the Government's burden when First Amendment rights are at stake. See *supra,* at 131–133.

It may be that the Government has an interest in suppressing lewd or "indecent" speech even when it occurs in private among consenting adults. Cf. *United States* v. *Thirty-seven Photographs,* 402 U. S. 363, 376 (1971). But cf. *Stanley* v. *Georgia,* 394 U. S. 557 (1969). That interest, however, must be balanced against the overriding interest of our citizens in freedom of thought and expression. Our prior decisions on obscenity set such a balance and hold that the Government may suppress expression treating with sex only if it meets the three-pronged *Roth-Memoirs* test. We have said that "[t]he door barring federal and state intrusion into this area cannot be left ajar; it must be kept tightly closed and opened only the slightest crack necessary to prevent encroachment upon more important interests." *Roth* v. *United States,* 354 U. S., at 488. Because I can see no reason why we should depart from that standard in this case, I must respectfully dissent.