**ANTON'S, INC., Relator,**

v.

**The CITY OF MINNEAPOLIS, Respondent.**

No. C9–85–937.

Court of Appeals of Minnesota.

Oct. 15, 1985.

Gerald M. Singer, William R. Skolnick, Minneapolis, for relator.

Richard S. Reeves, Minneapolis, for respondent.

Considered and decided by POPOVICH, C.J., and WOZNIAK and HUSPENI, JJ., with oral argument waived.

## OPINION

WOZNIAK, Judge.

Relator Anton's, Inc. applied to the Minneapolis City Council for a Class B liquor license. The application was denied, and this court granted a writ of certiorari to review the denial. We affirm.

## FACTS

Anton's, Inc. is a corporation consisting of two shareholders, Anna Benincasa and Anthony Benincasa. It has held a Class C on-sale liquor license and an all-night special food license for an establishment at 1900 Marshall Street N.E., known as "Anton's," since November 1984. On January 2, 1985, it applied to the Minneapolis City Council for approval to "upgrade" its liquor license to Class B, to expand its premises to the upper floor of the existing building in order to include a dance floor and additional seating, and to obtain a Sunday sales license.

A hearing was held before the Licenses and Consumer Services Committee of the Minneapolis City Council on February 20, 1985, and testimony was taken in support of and in opposition to the granting of the license.

Until September 1984, the premises were operated by the Benincasas' son, Anthony F. Benincasa, under the name "Gramma B's." Gramma B's held a Class A on-sale liquor license and offered adult entertainment, live bands, and dancing. It generated numerous police calls and complaints by neighbors for thefts, assaults, damage to automobiles, and parking problems. Gramma B's was eventually closed for failure to pay taxes.

Anna Benincasa testified that Anton's wanted a Class B on-sale license so that it could offer dancing for restaurant customers and so events such as wedding and anniversary parties and bowling banquets could be held. She emphasized that they wanted to continue operating a family restaurant and would not offer any "rock and roll" music, but would instead provide "easy listening" music. She offered a petition signed by over 500 people which read "to help us open our upstairs—please sign in favor." It did not provide the addresses of the signers. Finally, she stated that their son is not an owner or employee of Anton's, nor is he associated with the restaurant.

Testimony was offered regarding a community meeting held on October 17, 1984, at which Anna Benincasa explained her intent in operating Anton's to 20 to 25 neighborhood residents. While there was conflicting evidence presented at the hearing as to the sentiment of the neighbors, the committee found that a great majority of the people present expressed opposition to a license allowing live entertainment and

dancing because of the previous history when the establishment had such a license, resulting in late night disturbances of the neighbors, litter, noise and vandalism.

Several residents from the neighborhood also spoke at the hearing, expressing opposition to the type of entertainment allowed by the Class B license, in particular "rock and roll" bands, and expressing concern that parking and litter problems could result. Their fears were based upon their experiences with problems which arose from the operation of Gramma B's, and the fact that the operator of Gramma B's is the son of the owners of Anton's.

Several police officers testified. They related the record of police calls originating from Gramma B's and Anton's. Gramma B's had the highest number of police calls for a bar in the second precinct of Minneapolis while it was operating. Anton's has generated no police calls. In addition, there have been no complaints by the neighbors as to litter, property damage, or late night disturbances from Anton's. One officer indicated that both the management and the type of entertainment offered had an effect on whether or not an establishment has problems.

The committee concluded that a Class B license would not be compatible with the surrounding residential area, and would allow an overly intensive use of the premises and greatly increase the likelihood of late night activity which would disturb the residents of the neighborhood. It recommended that the application to upgrade the liquor license to Class B be denied and that the other requests be postponed for further consideration. The recommendations were adopted by the city council at its February 22, 1985, meeting, and approved by the Mayor on February 28, 1985.

Anton's obtained a writ of certiorari from the Hennepin County District Court on March 26, 1985. It then asked this court to issue certiorari nunc pro tunc, and to discharge the certiorari issued by the district court. This court made an order accordingly, and the matter is now before us for review.

## ISSUE

Was the Minneapolis City Council's decision to deny Anton's application to obtain a Class B on-sale liquor license arbitrary, capricious, or oppressive?

## ANALYSIS

### I.

Anton's applied to the city council to upgrade its on-sale liquor license from Class C to Class B. With either class of liquor license, Anton's may sell liquor and beer. Minneapolis, Minn., Code § 362.30(c), (d) (Supp.1983). A Class B license would allow Anton's to offer dancing by patrons and live music and singing, without limits as to the number of musicians or singers or type of amplification. Minneapolis, Minn., Code § 362.30(c) (Supp.1983). The type of adult entertainment previously offered by Gramma B's, however, is not permitted with a Class B license. *Id.* With a Class C license, Anton's is limited to offering music by three or fewer musicians, and no dancing is allowed. Minneapolis, Minn., Code § 362.30(d) (Supp.1983).

A city council has broad discretion in determining whether to issue a liquor license. *Wajda v. City of Minneapolis*, 310 Minn. 339, 343, 246 N.W.2d 455, 457 (1976). Our scope of review is narrow. *Id.*

> In reviewing the proceedings of the municipality it is not the court's function to pass on the wisdom of the revocation, but only to determine whether the council exercised an honest and reasonable discretion, or whether it acted capriciously, arbitrarily, or oppressively.

*Sabes v. City of Minneapolis*, 265 Minn. 166, 171, 120 N.W.2d 871, 875 (1963), *quoted in Miller v. City of St. Paul*, 363 N.W.2d 806, 811 (Minn.Ct.App.1985). The applicant has the burden of proving that the city council acted in an arbitrary manner. *Country Liquors, Inc. v. City Council of the City of Minneapolis*, 264 N.W.2d 821, 824 (Minn.1978).

The city council based its decision on two grounds: that the Class B license would not be compatible with the surrounding residential area, and that the Class B license, in conjunction with an all night special food license, would allow overly intensive use of the premises and would greatly increase the likelihood of late night activity which would disturb residents of the neighborhood.

Anton's contends that the city council based its denial of the Class B license on the disturbances created by Gramma B's, and that such a basis of the denial is impermissible under *Wajda*. It also contends that there is no evidence that it would cause problems similar to those caused by Gramma B's; it has generated no police calls and no neighborhood complaints.

Anton's seeks to have the court substitute its own factual determinations for those of the city council, reevaluate the weight and credence given by the city council to the testimony and exhibits, and substitute its judgment for city council members' collective experience, as elected representatives of their wards, with the problems caused by liquor establishments located in residential areas. It has framed its statement of the legal issues around erroneous assumptions that the city council based its denial of the Class B license on certain evidence, ignoring other significant evidence introduced at the hearing, as well as serious problems with the credibility of its representations and promises to the city council.

The character of the area around Anton's is low density residential and the establishment is in close proximity to many homes and adjacent to a park. Although there are some commercial buildings along Marshall Street, Anton's fails to point out that, unlike its own establishment, they do not generate late night activity which disturbs residents.

Opposition by residents whose lives would be directly affected by the establishment was clearly expressed at an October 17, 1984 meeting in the community. The concern of community residents was not confined to fears of a return of the adult entertainment and parking lot fights. Residents were justifiably concerned about the adverse effects on their neighborhood of entertainment in the form of live bands and dancing. Their concerns included customers in the parking lot in early morning hours disturbing residents, overparking on residential streets, litter, noise, and the increased potential for late night disturbances due to the offering of entertainment in conjunction with a special privilege to remain open all night to serve food. Such concerns are neither fanciful, speculative, nor unwarranted merely because Anton's has not yet been given a chance to "prove itself" by operating with a Class B license.

■ A liquor establishment with live music and dancing is qualitatively different from a restaurant which serves liquor only as an adjunct to food. With entertainment, customers tend to stay later, often until 1:00 a.m. or even later if the establishment is permitted to remain open all night. Customers tend to arrive and leave in large numbers at particular times corresponding to the beginning and end of the entertainment. This is especially true for special entertainment, wedding receptions and banquets, which Anton's proposes to conduct. Customers at an establishment with entertainment also tend to be younger and more boisterous. The city council thus properly concluded that the predominantly residential location of Anton's was unsuitable for a Class B license.

The city expressed doubt at Anton's professed intent to maintain the upstairs only for dancing by restaurant customers. It argues that it is inconceivable that the upstairs would merely complement the restaurant operation. Anna Benincasa made it abundantly clear that Anton's intended the upstairs to be used only for music, dancing, and liquor service. Anton's would be obliged to use frequent entertainment to attract large numbers of nonrestaurant patrons to fill the upstairs and make it profitable.

■ Anton's contends that the city council based the denial upon the conduct of the previous tenant, Gramma B's. Under *Wajda*, it is impermissible to base a decision on whether to issue a liquor license upon the misconduct of a prior licensee, who, in both *Wajda* and this case, happens to be the owners' son. However, the council may act to deny the liquor license based on "specific objections raised by community residents whose lives would be directly affected" by the proposed change. *Country Liquors, Inc.*, 264 N.W.2d at 824.

Appellants, however, read the *Wadja* decision as authority for the proposition that the denial of a license may not be predicated upon residents' complaints in the nature of projected ill effects on their neighborhood. This interpretation is erroneous. Our opinion in that case did not establish a rule of general application curtailing the evidentiary weight to be accorded citizen complaints in these proceedings. What troubled this court in *Wadja* was the fact that the subject matter of the residents' complaints, upon which the city so heavily relied, was not rationally related to Mrs. Wadja's personal qualifications as a license applicant.

*Id.* at 824–25.

Like the plaintiff in *Country Liquors, Inc.*, Anton's reads too much in the *Wadja* decision. Considered in light of *Country Liquors, Inc.*, *Wadja* is a very limited precedent. Anton's strains to fit the facts of this case into the *Wadja* mold. The city council was not concerned with Anna Benincasa's personal qualifications and capabilities to manage a liquor establishment. It was concerned with the suitability of the location for entertainment and the detrimental effects of the proposed license upgrade on the neighborhood. It was not arbitrary and capricious for the city council to conclude that allowing bands and dancing, which would draw customers who would tend to stay later than restaurant-goers, and who would arrive and leave in large numbers, would not be compatible with the surrounding area and would increase the likelihood of disturbances to the residents.

## II.

■ Finally, despite the fact that both parties have relied on liquor and beer licensing cases in their arguments, it is not accurate to characterize the city council's action in this matter as a denial of a liquor license. The city council's decision in no way affects Anton's basic privilege to sell intoxicating liquor, which is the essential feature of an on-sale liquor license. Rather, the city council's action should be properly characterized as a denial of a license to conduct a particular form of entertainment in an on-sale liquor establishment.

Respondent notes that many municipalities issue licenses for entertainment in liquor establishments which are separate and distinct from the on-sale liquor license itself. *See, e.g.*, St. Paul, Minn., Code ch. 411 (1985). The fact that the City of Minneapolis accomplishes the same purpose by using different classes of on-sale liquor licenses does not make its decision in this case a denial of an on-sale liquor license.

Courts have addressed this issue in several settings. In *Hude v. Commonwealth of Pennsylvania*, 55 Pa.Commw. 1, 423 A.2d 15 (1980), the court upheld regulations prohibiting live or recorded music emanating from a liquor establishment, holding that protection of residents living near a liquor establishment from interference with a peaceful environment is a valid objective of liquor regulations. A municipality's denial of a license to conduct live music and dancing was upheld on similar grounds in *Hudson Royal Restaurant v. Mayor and Aldermen of Jersey City*, 10 N.J.Misc. 629, 160 A. 218 (1932).

■ The United States Supreme Court has recognized, in several decisions concerning first amendment rights of freedom of expression, the strong local governmental interest in regulating the liquor business and the particular problems which entertainment in liquor establishments can present. In connection with entertainment, the court has distinguished liquor establish-

509

ments from places where alcoholic beverages are not served. The court has recognized that state and local governments may totally prohibit nudity and sexually explicit entertainment in liquor establishments, even though the same activities would enjoy first amendment protections if conducted elsewhere. *California v. LaRue,* 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972). The Minnesota Supreme Court has recognized the same distinction in *Koppinger v. City of Fairmont,* 311 Minn. 186, 248 N.W.2d 708 (1976).

## DECISION

The city council did not act in an arbitrary, capricious or oppressive manner when it denied the application of Anton's for a Class B liquor license.

Affirmed.