Charles JONES, Plaintiff,

v.

CITY OF TROY, a Municipal Corporation, et al., Defendants.

Civ. A. No. 39556.

United States District Court,
E. D. Michigan, S. D.

Dec. 16, 1975.

Noel A. Gage, Gage, Brukoff, Dubin & Siudara, Southfield, Mich., for plaintiff.

Stanley E. Burke, Burke & Sawyer, P. C., Troy, Mich., for defendants.

## OPINION

RALPH M. FREEMAN, District Judge.

This is an action by Charles Jones against the City of Troy, Michigan, and the seven City Commissioners of that municipality. The jurisdiction of this court has been invoked under 28 U.S.C. §§ 1331 and 1343(3). Relief is sought under 42 U.S.C. § 1983 for the defendants' alleged deprivation of the plaintiff's rights under the Fourteenth Amendment of the United States Constitution. The factual background of this case which is undisputed in most respects will be briefly summarized.

In May of 1971, the plaintiff made application to the Michigan Liquor Control

Commission for a "Class C" license[1] for use at a proposed establishment at a certain location in the City of Troy. Under Michigan law, local legislative bodies, such as the Troy City Commission, are empowered to approve the issuance of new liquor licenses which are allocated to local municipalities on a per capita basis.[2] The Liquor Control Commission thus referred the plaintiff to the Troy City Commission before proceeding with any investigation of its own.

The plaintiff's application ultimately came before the defendant City's Liquor Committee which the defendant describes as a "citizens advisory group" consisting of seven members appointed by the City Commission. The function of this Committee is to review all applications for alcoholic beverage licenses and make recommendations to the City Commission prior to its final action on each application.

Subsequently, the plaintiff was called upon to make a formal presentation of his proposed establishment to the Liquor Committee. The plaintiff presented his plans for a "Little Caesar's Family Inn", a sit-down family-type restaurant, seating approximately 225 persons, to be located in a then proposed shopping center in the City. The restaurant was to offer a limited menu consisting primarily of pizza, spaghetti and a variety of sandwiches, which would also be available on a carry-out basis. It was plaintiff's intention to offer beer and wine with this menu.

By a letter of November 10, 1971, the Liquor Committee informed the plaintiff that his application had been "tabled" for further study. The plaintiff's application was still pending one year later when, on November 6, 1972, the City Commission enacted Resolution No. 72–1056 which reads as follows:

"WHEREAS, the City Commission of the City of Troy has the sobering task of approving the issuance of Liquor Licenses to certain parties, and

WHEREAS, the Troy City Commission must endeavor to cause the greatest benefit to the community from the use of its approval powers in the matter of the issuance of Class "C" and Class "B" (Hotel) Liquor Licenses, NOW, THEREFORE, BE IT RESOLVED, that the following priorities be established for license approval for various kinds of facilities in the order of their decreasing effect and importance to the Troy Community:

(1) Food service facilities to be part of office, service and commercial center complexes, as provided in Article XXVI of Chapter 39 of Troy's Codes, being the guidelines for the Office-Service-Commercial District.

(2) Facilities that will accommodate large groups of people (seating more than 1,000 in banquet style) in banquet rooms and serve as exhibition halls for convention purposes.

(3) Hotel · or Lodging facilities which also have restaurants, meeting rooms and banquet facilities capable of serving in excess of 200 people in "sit-down" banquet facilities.

(4) A "Supper Club" type of operation in which high quality food service is the main source of income with the ability to provide open public dining and to serve small groups in separate meeting rooms and to also provide sit-down banquet facilities for groups in excess of 200 people in a single, undivided room, the food menu to offer no less than five different entrees which are prepared on the premises.

1. M.S.A. § 18.972(20), M.C.L.A. § 436.2t defines "class C License" as "any place licensed to sell at retail beer, wine and spirits for consumption on the premises."

2. M.S.A. §§ 18.988, 18.990(3), M.C.L.A. §§ 436.17, 436.19c.

(5) Food service operations which have gross seating capacities exceeding 200 in any arrangement (meeting rooms, open dining, etc.) with a menu offering no less than four different entrees to be prepared on the premises.

BE IT FURTHER RESOLVED, that all licenses be issued only after the following conditions are met and/or subject to the applicant's meeting certain conditions within a stated period of time:

(1) That floor plans, seating arrangements, site plans, building elevations, future building alterations and other pertinent physical features for proposed buildings be submitted to the Troy Liquor Committee.

(2) That the applicant's experience, financial capability, history of experience as a Class "C" licensee, proposed food service menus and other facts or proposals pertinent to the operation of the proposed facility be submitted to the Troy Liquor Committee.

(3) That the issuance of licenses be contingent upon the application for and receipt of site plan approval, building permits, zoning changes and other necessary approvals by Troy within six (6) months after the issuance.

(4) That construction be pursued within eight (8) months after the issuance of a license, at which time the progress of the applicant in meeting all of the above stated conditions will be reported by the City Manager and his subordinants (sic) to the Troy City Commission.

(5) That no floor plan, building elevation, site plan, seating arrangement, kitchen layout or other pertinent facts, drawings or documents submitted to the Troy Liquor Committee may be changed, unless it is a reasonable improvement in design or service function of the facility,

at such time the applicant seeks approval at any of the other administrative divisions of the City of Troy, nor upon final construction of buildings or alterations of them.

(6) That the failure of any applicant to meet any of the above conditions shall be reason for the Troy City Commission to deny the annual renewal of any of the licenses issued and, further, that a review of any license which has not been activated by the licensee will be conducted by the Troy City Commission, and, if satisfactory performance pursuant to the above conditions is not found, then the Troy City Commission reserves the right to withdraw its approval and deny the license at the time of review, or at the time of annual renewal.

BE IT FURTHER RESOLVED, that the Troy City Clerk be and is hereby directed to transmit this resolution to the Troy Liquor Committee and to further liquor license applicants so that the policy of the Troy City Commission may be made known."

On November 8, 1972, the Liquor Committee forwarded a copy of the new resolution to the plaintiff and asked that he make another presentation at its next scheduled meeting on November 13, 1972. The plaintiff appeared at that meeting and made a further presentation after which the Committee decided that his proposed establishment could be considered under classification number five of the Resolution. By a vote of 3 to 2 (2 members absent) the Committee then decided to recommend denial of the plaintiff's application for licensing of the proposed establishment. At a regular meeting of the City Commission held November 20, 1972, with one member absent, the plaintiff's application was unanimously disapproved.

The plaintiff subsequently commenced this action seeking the mandatory issuance of a license and money damages. It is his contention that the defendant

City's liquor licensing Resolution violates the Equal Protection Clause of the Fourteenth Amendment. The complaint alleges that the Resolution is unconstitutional on its face, as well as unconstitutional as applied.

■ Prior to the trial of this matter, the court considered the question of whether, as a matter of law, the Resolution is unconstitutional on its face. In a memorandum opinion of June 27, 1974, this court decided that issue adversely to the plaintiff.

In contending that the Resolution is unconstitutional on its face, the plaintiff argued that the five classifications established by the Resolution are in fact economic classifications which discriminate on the basis of wealth in the creation of two disfavored classes:

(1) All liquor license applicants whose applications qualify for any one of the Resolution's classifications of facilities except the · highest; and

(2) all liquor license applicants or potential applicants who do not have the financial ability or means to come within any of the classifications in the Resolution.

After applying the "rational basis test" of equal protection analysis, this court found that the classifications established by the Resolution were a rational method of promoting the stated objective of the Resolution: "to cause the greatest benefit to the community from the use of its approval powers."

. . . the general purpose enunciated in the resolution is a permissible and legitimate legislative purpose—a desire to best serve the community. How the greatest benefit to the community can best be provided is properly a matter of judgment best left to local elected officials since this court does not have the expertise or familiarity with local needs and circumstances to make wise decisions on this subject. Moreover, the court cannot say that the priorities set up by the resolution do not have a rational connection to the objective of that resolution. For example, the higher priority facilities, if they require a greater minimum investment than the lower ones, will add more to the tax base of the city and so afford the city greater financial benefits than the lower priority facilities. It is also logical to assume that the higher priority facilities will create more jobs than other facilities. (Memorandum Opinion, June 27, 1974, pp. 8–9)

The above-quoted language demonstrates this court's application of the principle stated in *McGowan v. Maryland,* 366 U. S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it."

■ The issue of facial constitutionality having thus been resolved, a bench trial was conducted on the issue of whether the Resolution violates the Equal Protection Clause in its actual application by the defendant City of Troy.

As was stated in the plaintiff's trial brief, the legal issue at trial was simply "whether the classification of the resolution as applied to your Plaintiff can be justified under the Equal Protection Clause."

It must be noted that at least one major aspect of the plaintiff's post trial claim of discrimination evolved during the trial and was not raised in the plaintiff's trial brief or the pre-trial order. The plaintiff now contends that the evidence shows that the Resolution was applied to him, but that at least three successful applicants were not held to its requirements. [Plaintiff's post-trial brief, pp. 5–7, 31–35]. It must also be noted that the interrogatory answers upon which the plaintiff relied in support of this claim of discriminatory application were available to the plaintiff in advance of trial.

Prior to the post-trial final arguments, both counsel were asked to address the question of whether the court

should reconsider its ruling on the facial constitutionality of the Resolution. The court has reviewed its prior ruling and remains confident of the correctness of its earlier decision which upheld the facial constitutionality of the Resolution upon a "rational basis test" analysis. After reviewing the evidence adduced by both parties at trial, it has been further concluded that there has been no constitutional violation in the defendant City's application of the Resolution.

Throughout the prosecution of this lawsuit, plaintiff's counsel have spent most of their legal argument in attempting to convince this court that the Resolution in question must be tested by an equal protection standard more stringent than the "rational basis test." They correctly point out that the so-called "two-tiered" approach has traditionally been used in testing the constitutionality of legislative classifications. On the lower "tier", classifications are constitutionally valid if they bear a reasonable relationship to the legislative purpose. *Railway Express Agency, Inc. v. New York,* 336 U.S. 106, 69 S.Ct. 463, 93 L. Ed. 533 (1949). However, classifications which are based on "suspect" criteria, or infringe upon a constitutionally recognized "fundamental" right can only be justified upon a showing of a "compelling governmental interest." *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). The practical effect of the less stringent test has been almost total deference to legislative judgment, while the "compelling state interest" standard has rarely, if ever, been satisfied.

This court has no quarrel with the plaintiff's contention that several decisions of the United States Supreme Court show the development of a "new" standard of equal protection analysis which, in some instances, may elevate the level of scrutiny of the traditional rational basis test. *Weber v. Aetna Casualty & Surety Co.,* 406 U.S. 164, 92 S. Ct. 1400, 31 L.Ed.2d 768 (1972); *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.

Ed.2d 225 (1971); *Levy v. Louisiana,* 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968). But, as explained below, this court cannot agree with plaintiff that these cases require anything more than a "rational basis" analysis in the case at bar.

*Levy v. Louisiana, supra,* involved a state wrongful death action statute which excluded illegitimate children from the class of dependents who could bring such an action. The Court held this distinction impermissible because it so seriously disadvantaged a discrete class without rational connection to the state's avowed purpose of discouraging illegitimacy.

*Reed v. Reed, supra,* presented a challenge to a provision of the Idaho probate code which gave a mandatory preference to men over equally qualified women for appointment as a decedent's administrator. In a brief and unanimous opinion the Court relied on its 1920 decision in *Royster Guano Co. v. Virginia,* 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 and held the sex based preference violative of the Equal Protection Clause.

"Clearly the objective of reducing the workload on probate courts by eliminating one class of contests is not without some legitimacy. The crucial question, however, is whether § 15–314 advances that objective in a manner consistent with the command of the Equal Protection Clause. We hold that it does not. To give a mandatory preference to members of either sex over members of the other, merely to accomplish the elimination of hearings on the merits, is to make the very kind of arbitrary legislative choice forbidden by the Equal Protection Clause of the Fourteenth Amendment; and whatever may be said as to the positive values of avoiding intrafamily controversy, the choice in this context may not lawfully be mandated solely on the basis of sex." 404 U.S. at 76–77, 92 S.Ct. at 254.

*Weber v. Aetna, supra,* concerned a provision of the Louisiana Workmen's

Compensation statute which had been interpreted by the courts of that state to deny unacknowledged illegitimate dependents the same recovery rights enjoyed by other dependents of a decedent. After determining that *Levy* was the applicable precedent, the *Weber* opinion turned to some explanation of what has since been characterized as the "new" equal protection standard.

"The tests to determine the validity of state statutes under the Equal Protection Clause have been variously expressed, but this Court requires, at a minimum, that a statutory classification bear some rational relationship to a legitimate state purpose. *Morey v. Doud,* 354 U.S. 457 [77 S.Ct. 1344, 1 L.Ed.2d 1485], (1957); *Williamson v. Lee Optical Co.,* 348 U.S. 483 [75 S.Ct. 461, 99 L.Ed. 563], (1955); *Gulf, Colorado & Santa Fe R. Co. v. Ellis,* 165 U.S. 150 [17 S.Ct. 255, 41 L.Ed. 666], (1897); *Yick Wo v. Hopkins,* 118 U.S. 356 [6 S.Ct. 1064, 30 L.Ed. 220], (1886). Though the latitude given state economic and social regulation is necessarily broad, when state statutory classifications approach sensitive and fundamental personal rights, this Court exercises a stricter scrutiny, *Brown v. Board of Education,* 347 U.S. 483 [74 S.Ct. 686, 98 L.Ed. 873], (1954); *Harper v. Virginia State Board of Elections,* 383 U.S. 663 [86 S.Ct. 1079, 16 L.Ed.2d 169], (1966). The essential inquiry in all the foregoing cases is, however, inevitably a dual one: What legitimate state interest does the classification promote? What fundamental personal rights might the classification endanger?

\* \* \* \* \* \*

We do not question the importance of ["Louisiana's interest in protecting 'legitimate family relationships']; what we question is how the challenged statute will promote it." 406 U.S. at 172–173, 92 S.Ct. at 1405.

But the *Weber* opinion was careful to distinguish the then recent ruling in *La-bine v. Vincent,* 401 U.S. 532, 91 S.Ct. 1017, 28 L.Ed.2d 288 (1971) on grounds which this court believes are material to the decision in the case at bar.

"In *Labine,* the Court upheld, against constitutional objections, Louisiana intestacy laws which had barred an acknowledged illegitimate child from sharing equally with legitimate children in her father's estate. That decision reflected, in major part, the traditional deference to a State's prerogative to regulate the disposition at death of property within its borders. [401 U.S. at 538, 91 S.Ct. 1017 at 1020]. The Court has long afforded broad scope to state discretion in this area. Yet the *substantial state interest* in providing for 'the stability of . . . land titles and in the prompt and definitive determination of the valid ownership of property left by decedents,' *Labine v. Vincent,* 229 So. 2d 449, 452 (La.App.1969), is absent in the case at hand." (emphasis supplied) 406 U.S. at 170, 92 S.Ct. at 1404.

It is clear that here, unlike in *Levy, Reed* and *Weber,* the Resolution in question does not individiously discriminate against a discrete group of persons which is in any way suggestive of a "suspect" class. (Such as women in *Reed,* and illegitimate children in *Levy* and *Weber.*) Nor does the Resolution threaten the exercise of any personal right which might be characterized as "fundamental". Moreover, upon a review of the defendants' evidence at trial this court is satisfied that the Resolution is indeed rationally related to the exercise of two substantial state interests—the regulation of alcohol and land use control. *Hostetter v. Idlewild Liquor Corp.,* 377 U.S. 324, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964); *Village of Euclid v. Ambler Realty,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926).

The pervasiveness of the State's power and interest in the regulation of alcohol is demonstrated by the recent decision in *California v. LaRue,* 409 U.S.

109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972). In that case a state statute which forbid certain explicit sexual activity and entertainment in bars and nightclubs was upheld as a permissible exercise of the state's power to regulate the terms and conditions of the sale of alcoholic beverages. It was particularly significant that California's regulatory scheme was upheld despite the District Court's finding that at least some of the proscribed activity was not obscene, as a matter of law.

> "The substance of the regulations struck down prohibits licensed bars or nightclubs from displaying, either in the form of movies or live entertainment, 'performances' that partake more of gross sexuality than of communication. While we agree that at least some of the performances to which these regulations address themselves are within the limits of the constitutional protection of freedom of expression, the critical fact is that California has not forbidden these performances across the board. It has merely proscribed such performances in establishments that it licenses to sell liquor by the drink."

> \*     \*     \*     \*     \*     \*

> "The Department's conclusion, embodied in these regulations, that certain sexual performances and the dispensation of liquor by the drink ought not to occur at premises that have licenses was not an irrational one. Given the added presumption in favor of the validity of the state regulation in this area that the Twenty-first Amendment requires, we cannot hold that the regulations on their face violate the Federal Constitution."

409 U.S. at 118–119, 93 S.Ct. at 397.

The plaintiff has strenuously argued that to the extent that the Resolution in question is based on zoning considerations it must be held invalid since the City's authority in the area of land use control is totally unrelated to its authority to control liquor. Citing *Levy v.*

*Louisiana, supra,* the plaintiff argues that "[T]his resolution is essentially a zoning and building resolution which the Defendants seek to insulate from review under the aegis of their power to control liquor." Plaintiff's Post-Trial Brief, p. 20. But this court's reading of the *Levy* opinion lends no support to the plaintiff's argument in this case. As explained above, *Levy* merely held that the statutory discrimination was impermissible because it so seriously disadvantaged illegitimate children without rational hope of achieving the state's announced objective of encouraging legitimacy. In this court's view, the zoning and land use considerations which are reflected in the Resolution are an entirely proper and legitimate use of the City's authority to plan, direct and sustain its commercial development in an orderly manner. The trial testimony of the defendant's City Manager, Mr. Frank Gerstenecker, amply supports the easily understood fact that the economic viability, and thus the very existence, of hotels and restaurants may often depend upon being licensed to sell alcoholic beverages. Indeed, the plaintiff's own testimony at trial was that beer and wine sales at other Little Caesar's Family Inn establishments represented as much as 28–31 per cent of their total revenue, and without the license he seeks, Mr. Jones has found it unfeasible to proceed with his proposed restaurant.

■■ If liquor licenses were available in unlimited numbers the considerations might well be different, but as was established at trial, only thirteen new licenses were available for allocation by the City of Troy as a result of the 1970 census. Given these circumstances it would be totally unrealistic to require the defendant City to somehow ignore its land use planning and development responsibilities when considering liquor license applications. The valid exercise of liquor licensing authority necessarily transcends the mere control of the "evils" traditionally associated with the public sale and consumption of alcohol.

See *Crowley v. Christiansen*, 137 U.S. 86, 11 S.Ct. 13, 34 L.Ed. 620 (1900).

■■ The great economic value of liquor licenses to the private persons to whom they are granted places an especially heavy burden on public officials to ensure that such licenses are distributed on a basis consistent with maximum public benefit. Evidence at trial demonstrated that the defendant city officials were cognizant of this responsibility when they promulgated the Resolution. In a memorandum from the Troy City Manager to the Mayor and the City Commission dated November 6, 1970, Mr. Gerstenecker outlined the considerations he felt important in drafting the then proposed Resolution. At page 2 of that memorandum he stated:

> It is felt that it is deemed wise to issue licenses to those who are going to use them for their own establishments rather than to those who are going to use them for speculatory purposes.
>
> If we are to avoid the problem of speculatory use, we might attempt to make the issuance of a license conditioned upon the approval of the building permit, site plans, zoning requests, etc. This would tend to assure the actual use of the license by the applicant. Defendants' Exhibit No. 11.

Certainly this objective, which was reflected in the Resolution as ultimately adopted, is properly within the scope of the City's liquor control authority. *California v. LaRue, supra.*

■ Finally, the plaintiff contends that the evidence at trial establishes a selective and therefore discriminatory application of the Resolution which worked to deny him the license he sought. He contends that at least three applicants—Stouffers, Tomsin Food Enterprises and Paradiso Villa—were granted licenses although they had not complied with the express requirements of the Resolution. As evidence of this alleged discrimination the plaintiff introduced the defendants' answer to plaintiff's interrogatory No. 7 which

stated that no categorization of the three above-mentioned establishments (within one of the 5 classifications of the Resolution) was possible since no information was available concerning their actual seating capacities. The plaintiff points to that portion of the Resolution which requires an applicant to submit, among other things, the seating arrangement of a proposed establishment. It is the plaintiff's argument that since these establishments were licensed without first being required to demonstrate their exact seating capacity, it is clear that they were not subjected to the terms and conditions of the Resolution as he was.

In the court's view the plaintiff has not sustained his burden of establishing that the three above-mentioned establishments were not required to substantially comply with the requirements of the Resolution. The record supports the defendants' argument that at the time the three licenses in question were approved, the Liquor Committee had sufficient information to satisfy itself that each establishment was within the scope of at least one of the Resolution's categories. Even if this was not the case, the plaintiff has cited no authority which would entitle him to the relief he seeks. There has been no showing that, but for the success of the three applicants who allegedly did not comply with the Resolution, the plaintiff's application would have been approved.

■ The court will observe that the plaintiff's theory of this action has seemed to rest upon a perception of the Resolution which, at trial, was shown to be inaccurate. The plaintiff would have this court say that once the defendant City established the Resolution, it divested itself of the discretion it previously had in approving liquor license applications, and that any applicant who technically fell within any of the five categories would be entitled to automatic approval. Much emphasis has been placed upon a letter of November 8, 1972 with which Mr. Forest Fisher, Police

Chief and secretary of the Liquor Committee, transmitted a copy of the Resolution to the plaintiff. That letter reads in part:

At the City Commission meeting on November 6, 1972, the attached resolution was passed.

If you are prepared to meet the requirements stated in the resolution, please contact this office by Monday, November 13, 1972, and we will arrange for you to make your presentation to the Liquor Committee that evening. Plaintiff's Exhibit No. 7

The plaintiff's argument seems to characterize this letter as a commitment for approval of his application if he could demonstrate compliance with the requirements of the Resolution. Such a construction of that letter is unreasonable. The defendants' answers to the plaintiff's interrogatories, and the trial testimony of Mr. Forest Fisher clearly demonstrate that the individual members of the Liquor Committee continued to exercise their discretion on a case by case basis even after enactment of the Resolution. The trial proofs have shown that the Resolution does not encompass every factor considered by the Liquor Committee in passing on a license application. In actual application the Resolution has been used by the defendant City as a mere guideline and not as a strict set of priorities.

As explained above, the defendant City's chosen method of discharging its liquor control responsibility is to be given the greatest deference. This court is satisfied that no constitutional violation has occurred in this case.

Judgment will, therefore, be entered for the defendants. An appropriate form of judgment shall be submitted.