Abraham SHAMIE, Plaintiff,

v.

CITY OF PONTIAC, Wallace E. Holland, Ralph W. Behler, John E. Appleton, Robert W. Bowens, Louis M. Palace, Robert J. Parker, Marquerite Simpson, Frank Smiley, H. Tom Padilla and Elizabeth Stogdill, Defendants.

Civ. A. No. 5–72400.

United States District Court,
E. D. Michigan, S. D.

Dec. 29, 1977.

Lawrence S. Katkowsky, Levant, Keller & Katkowsky, P. C., Southfield, Mich., for plaintiff.

Peter A. Letzmann, City of Pontiac, Dept. of Law, Deputy City Atty., Pontiac, Mich., for defendants.

## OPINION

FEIKENS, District Judge.

This case illustrates the frustration that a person has in his dealings with government.

In March of 1970, plaintiff Abraham Shamie filed an application with the Michigan Liquor Control Commission for premises known as 40 W. Pike St., Pontiac, Michigan, seeking a Class C license. This application (and others subsequently filed) was referred by the Commission to the City of Pontiac for investigation and recommendation. Shamie's efforts to obtain a liquor license have been ongoing (and unsuccessful) for the last seven years and eight months. Even though this delay has been the source of a basic complaint, his suit here raises claims of deprivation of procedural due process and equal protection.

There have been numerous occasions during this nearly eight-year period in which a city official could have spent some time with Shamie explaining the various steps that he had to take, why these steps were necessary, and what information had to be furnished in order to complete the processing of his applications. Shamie, it is clear, was not too perceptive in these matters and needed substantial help. He tried to do it himself, and frequently he furnished incomplete information to the City. Perhaps, in part, this accounts for the reason he received no decision on his various applications.

In December, 1975, Shamie secured legal counsel and filed a complaint in this court. In it he charges that the defendants had violated his constitutional rights, citing the Fourteenth Amendment, and he claims both a continuing denial of due process and equal protection of the law. Jurisdiction is founded on 28 U.S.C. §§ 1331,[1] 1343, and 42 U.S.C. § 1983. This opinion constitutes findings of fact and conclusions of law.

## I.

Illustrative of the difficulty that has marked the course of Shamie's applications are the following facts: In 1970, he submitted an application and a proposed floor plan to the City. In 1971, he again applied to the City for a license. No action of any kind was taken on either application until the fall of 1973. What prompted action then was that on November 3, 1973, the City amended its Ordinance 1588 (regarding liquor license applications). The pertinent amendments required the city clerk to make a referral of applications for study and approval to various city departments. Frank Smiley, a defendant and then Pontiac City Manager, accordingly sought a survey from his staff to determine the status of all pending liquor license applications, the dates of the applications, the locations to which each application referred, and the status of each application. As a result of this activity, four license applications were recommended to the Michigan Liquor Control Commission for approval in May, 1974. Shamie's pending applications, although listed in the survey, were not acted upon by the City.

In July, 1974, he submitted a blueprint of a proposed floor plan in support of his pending applications. Nothing occurred. In March, 1975, Shamie again submitted an application for a liquor license to the Michigan Liquor Control Commission and again it was referred to defendant City Commission for consideration. Nothing occurred. In fact, during all of this period, from the date of plaintiff's first application in 1970 until December, 1975, plaintiff's applications were never placed on the agenda of the City Commission for approval or disapproval.

Meanwhile, on August 19, 1975, the city commission adopted a new "Standard Procedure for Routing of a Liquor License Application" known as Resolution 711. (Plaintiff's Exhibit 19). Thus, when plaintiff's initial complaint was filed in this court and a hearing was held on an order to show cause why a temporary restraining order should not be granted, defendants' attorney called attention to Resolution 711 and suggested to the court that the procedure in that resolution be followed by the parties and that after these steps had been taken, a report be made to the court. This was acceptable to plaintiff's counsel, and

---

1. Plaintiff was permitted by court order to amend his complaint in this particular immediately prior to trial to assert his claim against the defendant City.

the court suggested that if, after the detailed steps had been taken, set forth on page six of Resolution 711, and the Commission disapproved plaintiff's application, it should state the reasons for its action. To this, counsel for the defendants agreed, and this was made an order of this court. This hearing occurred on December 16, 1975.[2] (See transcript of hearing of December 16, 1975, pp. 26, 30, 32, 37). By April 15, 1976, all necessary reports required by the procedure of Resolution 711 had been submitted by plaintiff and had been acted upon by all departments, with all departments reporting favorably on plaintiff's liquor license application.[3] This is somewhat troublesome in that it appears that at that time plaintiff's blueprints showed a seating capacity for only eighty (80) persons. For plaintiff to be in a priority category the seating capacity would have to be at least one hundred and seventy-five (175) people. This is why plaintiff filed an amended plan on May 26, 1976, providing for a seating capacity of two hundred and nine (209) people and food service. This placed him in a category five (5) priority.

The matter of floor plans and seating arrangements had been a continuing area of difficulty. Defendant City apparently sought sealed architect's plans from Shamie as early as October, 1970. Shamie testified that as he attended Commission meetings in the period from 1971 on, "they [the Commission] kept asking for plans." It appears that Shamie furnished an additional equipment layout drawing on July 12, 1974. On November 22, 1974, an internal city memorandum (Plaintiff's Exhibit 15) indicates that the inspection services division of the City needed two sets of sealed drawings which would include site plans showing parking, architectural plans showing interi-

or and exterior changes to the building (at 40 W. Pike St.) and heating, plumbing and electrical systems drawings.[4] On February 26, 1976, Shamie submitted a plan on 8½" × 11" paper. This was disapproved per city internal memorandum dated March 8, 1976. (Plaintiff's Exhibit 32). On April 6, 1976, architect's plans (Plaintiff's Exhibit 51a–51e) were filed by Shamie, but these plans, as was noted earlier, provided seating capacity for eighty (80) people only.

On April 29, 1976, the city clerk reported to the commission that there were no technical reasons to deny the application but noted (Plaintiff's Exhibit 35) that the City Commission might want to consider that the seating capacity in the proposed facility was eighty (80). On May 11, 1976, the Commission reviewed Shamie's application and denied it stating that this application was not "consistent with the priorities established." (Plaintiff's Exhibit 36). Shamie was sent a copy of this action and invited to petition for a review of the rejection if he so wished to do. On the same day, inexplicably, the City Commission tabled action on Shamie's application for one (1) week. On May 18, 1976, the City Commission again rejected the application. On May 19, 1976, Shamie sought rehearing and on May 26, 1976, he filed an amended seating plan for two hundred and nine (209) people.

The rehearing was held on June 1, 1976. A transcript of the recording of that hearing (Plaintiff's Exhibit 4a) reveals that Shamie advised the City Commission that he had filed new "blueprints" showing a new seating capacity over one hundred and seventy-five (175) people. This triggered the reading of a letter to the city clerk from Donald B. Richards, Building and Licensing Supervisor, Inspection Services Division,

---

2. In Defendants' Proposed Statement of Facts, filed in this court and cause on October 19, 1977, defendants say on page 4 that on December 16, 1975, they stipulated to process Shamie's application anew in accordance with Resolution 711.

3. In Defendants' Counter-Statement of Facts and Law, filed in this court and cause on October 28, 1977, defendants agree with plaintiff's

proposed finding of fact # 18 and in their paragraph 18 that they stipulated to the fact "that all departments have received the necessary reports and had reported favorably on plaintiff's liquor license application. Defendants further say that there were no negative reports."

4. This concern as to plans is also considered in plaintiff's Exhibits 11, 12(d) and (e).

stating in part: "On May 26, 1976 . . . . [T]he revised plans provide for a seating capacity of 209 and food service which would place it in Category 5 . . . ." The letter goes on to say that the inspection services division finds "no reason to recommend disapproval." (See Plaintiff's Exhibit 44). The City Commission refused to accept this report and also refused to accept the amended seating plans. On June 8, 1976, the City Commission again denied Shamie's application.

## II.

■ Plaintiff's claim in essence is this—that the defendants violated his right to procedural due process in the following respects: (1) that it refused and neglected to follow the requirements in its ordinances; (2) that it refused to consider the modified floor plan submitted by plaintiff on or about May 26, 1976; (3) that the defendants did not afford plaintiff the opportunity to confront any adverse witnesses or evidence at any hearing afforded plaintiff; and (4) that they did not give plaintiff a statement of their findings and reasons for refusing his application. In support of his claims, plaintiff relies particularly on *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), and *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1969). Plaintiff in essence claims a deprivation of a property interest. It is clear from the reading of these cases that when a property interest exists or when there is a claim of entitlement, procedural due process protects such interests; that is to say, no action by the state may be taken without at least a hearing and a statement of reasons in the event of an adverse result. Thus the threshold question is whether or not plaintiff's interest in his various applications for liquor licenses and the activity in which he engaged to obtain that license are protected in this sense.

Defendant City and individual defendants, who are various city commissioners and other city functionaries, are involved in the decision-making process to determine whether an application for a liquor license shall be recommended to the Michigan Liquor Control Commission for approval. This is provided for in Section 17 of the Michigan Liquor Control Act. It provides in pertinent part:

All applications for licenses to sell beer and wine or spirits for consumption on the premises . . . shall be approved by the local legislative body in which said applicant's place of business is located before being granted a license by the commission . . . . (M.C.L.A. 436.17)

Plaintiff's various applications accordingly were filed initially with the Michigan Liquor Control Commission and were referred by that Commission to the City of Pontiac for investigation and approval. It is because plaintiff claims that the City and the individual defendants, in denying his application for a license, deprived him of process due him under the Fourteenth Amendment, citing 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 1983, that he now brings this suit.

A discussion as to whether or not plaintiff has a property right or a claim of entitlement within the meaning of the Fourteenth Amendment must begin with an analysis of state law. Numerous Michigan decisions are helpfully footnoted and reviewed in the concurring opinion of Mr. Justice Levin in *Bisco's, Inc. v. Liquor Control Commission,* 395 Mich. 706, 238 N.W.2d 166 (1976). The Michigan Supreme Court in *Bisco's, Inc., supra* at 710, 238 N.W.2d at 167 points out that:

In *Bundo* we held that an individual seeking a renewal of a class C liquor license under § 17 of the Michigan Liquor Control Act (MLCA) has an "interest" in "property" such that he is entitled to due process protection. For the reasons set forth in *Bundo* we find the plaintiff, as a liquor licensee, is entitled to due process protection in seeking renewal of a class B-hotel liquor license.

To the same effect, see *Morse v. Liquor Control Commission,* 319 Mich. 52, 29 N.W.2d 316 (1947), in which the Court dealt with a liquor license holder named Davey,

who had a license to sell only beer and wine under an "A" license. He applied for a "B" license which would have permitted him to sell spirits in addition to the beer and wine which he was licensed to sell. The Court found that although Davey had a protected interest in the "A" license which he held, he had no such protected interest in the "B" license for which he was making application. Citing multiple authorities, the Michigan Supreme Court stated, at page 66, 29 N.W.2d at page 322:

> Notwithstanding that the liquor business is entirely lawful, no one has an inherent right to a liquor license which is a privilege granted by the State under proper restrictions. (Citing *Case v. Liquor Control Commission,* 314 Mich. 632, 23 N.W.2d 109 (1946) ).

Suffice it to say that a careful reading of Michigan case law (*Bisco's Inc., supra,* and *Bundo v. Walled Lake,* 395 Mich. 679, 238 N.W.2d 154 (1976) ), reveals that while there is a protected interest in a liquor license that has been issued and/or is subject to renewal or to revocation, there is no protected interest in an application for a license itself. The United States Supreme Court suggested this distinction in *City of Kenosha v. Bruno,* 412 U.S. 507, 515, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1972); it pointed out that the claimed protected interest in a liquor license, which was up for renewal, had to be considered in the light of *Roth* and *Sindermann.*

■ In both *Roth* and *Sindermann,* the Court described "property" as a broad range of interests that are "secured by existing rules or understandings." In *Sindermann,* 408 U.S. at p. 601, 92 S.Ct. at p. 2699 the Court states that:

> We have made clear in *Roth, supra* [408 U.S.] at 571–572 [92 S.Ct. 2701], that "property" interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather, "property" denotes a broad range of interests that are secured by "*existing rules or understandings.*" *Id.,* at 577, 92 S.Ct. 2701. A person's interest in a benefit is a "property" interest for due process pur-

poses if there are such rules *or mutually explicit understandings* that support his claim of entitlement to the benefit and that he may invoke at a hearing. (emphasis supplied)

In a concurring opinion in *Bisco's Inc., supra,* 395 Mich. at p. 716, 238 N.W.2d at 167, Mr. Justice Levin considered these United States Supreme Court cases and said:

> A liquor license is a franchise bestowed by the sovereign and just as the state may choose not to issue a license, it may place reasonable conditions on it.

> But once a liquor license has been issued and expenditures have been made in reliance on it, the licensee has acquired an interest "secured by existing rules or understandings."

Thus, under Michigan law an applicant for a liquor license, as distinguished from a license holder facing renewal or revocation proceedings, does not have a protected interest. The holder of a liquor license may well have a legitimate claim of entitlement to its renewal. One applying for a liquor license has no such claim of entitlement. In the former case there is a "property" interest; in the latter there is none.

Claims of this kind have been made in federal appellate courts, and indeed in the United States Court of Appeals for the Sixth Circuit in the case of *Lewis v. City of Grand Rapids, et al.,* 356 F.2d 276 (6 Cir. 1966). In that case the lower court vacated an order of the Grand Rapids City Commission denying approval of the transfer of a Class C liquor license to appellee, one Lewis. Speaking for that court of appeals, Judge O'Sullivan carefully pointed out that Lewis was not a licensee and could become such only upon approval of the transfer. The court recognized in its opinion that the Michigan legislature had structured a difference between the issuance of a new license and the revocation of an existing one. It pointed out that since

> "Lewis did not own a license . . . the opportunity to seek approval to become an owner [of one] was not . . . a property right."

The Sixth Circuit in the *Lewis* case had before it the case of *Hornsby v. Allen,* 326 F.2d 605 (5th Cir. 1963). In *Hornsby,* the Fifth Circuit had held that municipal authorities are not freed from due process requirements in granting liquor licenses and are not allowed to exercise an uncontrolled discretion in regard to liquor licensing on the ground that a liquor license is a privilege. In that case minimal due process was required even in an application for license situation. Care must be taken to note that the *Hornsby* decision came well before *Roth* and *Sindermann.* In any event, the Sixth Circuit pointed out that in *Hornsby* the case had come up on review of the dismissal of plaintiff's complaint on defendant's motion. Thus the allegations of plaintiff's complaint had to be considered as admitted and they charged that the denial of the license application was "arbitrary, unreasonable, unjust, capricious, and discriminatory." The Sixth Circuit was of the opinion that had the Fifth Circuit not been faced with the case in that posture, it might have reached a contrary result. In any event, the Sixth Circuit in *Lewis* hesitated to follow *Hornsby.* Even the Fifth Circuit in later decisions had some reservations. See, for example, the opinion on rehearing (which reaffirmed its prior decision, but nevertheless limits the holding or at least clarifies it), 330 F.2d 55 (5th Cir. 1964); *see also, Atlanta Bowling Center, Inc. v. Allen,* 389 F.2d 713 (5th Cir. 1968).

For an excellent treatment of this entire subject, *see, Baker-Chaput v. Cammett,* 406 F.Supp. 1134 (D.N.H.1976). In that case, then District Judge Bownes points out that the initial inquiry that must be made is to determine whether the private interest at stake is a property interest protected by the Fourteenth Amendment, and that court discusses cogently how that analysis is to be made.

■ In the case at bar, I am compelled to conclude that were it not for the mutually explicit understanding reached by the parties and the court in this case, while this case was pending, plaintiff Shamie would have no claim of entitlement to procedural due process. Absent the special circumstances in this case, I would conclude that Shamie has no property interest of which it could be said that he was deprived. That was the holding in *Ryan v. Aurora City Board of Education,* 540 F.2d 222 (6th Cir. 1976), where the court stated that the school board was not required by due process to give "reasons" for the nonrenewal of the contracts of nontenured teachers, even though the Board's own regulations required such "reasons." In this case we have a significant additional factor. Resolution 711 was promulgated by defendant City while Shamie's applications were pending before it and while this case was before this court. It was *then* that defendants' counsel offered (on a hearing to show cause) that the requirements set forth in Resolution 711 should serve as acceptable criteria for determining plaintiff Shamie's application for a liquor license and that the procedure of Resolution 711 would be fully followed by defendants. This court thereupon suggested to defendants' counsel that in the event of denial, the City Commission set forth the reasons for its denial in writing. Defendants' counsel assented to this, and the agreement became an order of this court. This set of circumstances established more than merely a city resolution requiring the City to follow its own regulations; it established a "mutually explicit understanding" that Resolution 711 would be complied with and written reasons would be given by the City, if the decision was adverse to plaintiff.

I find that there has been no compliance with this mutually explicit understanding. I am unable to understand why, after all of the difficulties that were encountered in connection with the submission of the drawings and floor plans, that the City, on the occasion of the rehearing which it afforded plaintiff, truculently refused to consider his amended plans (which placed him in a higher priority category). I also do not understand why reasons were not given for the rejection of the application as required by the agreement and the order of this court. While counsel for defendants argues that a reason was given—that Shamie's applica-

tion was "not consistent with the priorities established"—such statement is in actuality no reason at all since the City refused to consider Shamie's amended plans.

I do not indicate by this decision that the City Commission has no discretion to accept or reject Shamie's application. I do not adopt a position that requires that a liquor license application be accepted if the technical criteria have been met. What is required by this decision is that the City give full consideration to all of the data submitted by Shamie in support of his application, and in the event that his application is denied, the reasons for the denial be forthrightly stated in writing.

To a possible contention that may be made that plaintiff receives by indirection the relief to which he is not entitled, I need only note that the procedure that ought to be followed was the procedure suggested by defendants, adopted by plaintiff, and approved by the court. This procedure has become, for the purpose of this case, an entitlement secured by "a mutually explicit understanding" within the meaning of *Sindermann.* To decide otherwise would be to make a mockery of the concept of due process.

I thus conclude that plaintiff is entitled to have the defendants consider his application in the light of the amended materials furnished prior to the rehearing of his application held June 1, 1976, and that in the event the application is denied, the reason(s) for the denial be stated in writing. Having found for the plaintiff and against defendants, I assess exemplary damages for denial of procedural due process of $25.00 per day from June 8, 1976—the date the application was denied without consideration of all of the data submitted and without the giving of reason(s)—until minimal due process as ordered by this court is afforded. If such steps are not taken within 90 days of the date an order is entered in this case, plaintiff may apply for further appropriate relief.

This finding of liability is made only against the City, and not against the individual defendants, because the mutually ex-plicit understanding was made between plaintiff and the City and did not involve the defendants as individuals. The other complaints raised by plaintiff are also unnecessary to decision. See, *Jones v. City of Troy,* 405 F.Supp. 464 (E.D.Mich.1975).

An appropriate order may be submitted.